740 F.2d 1262
 239 U.S.App.D.C. 159
 William T. SCHOR, Petitioner,
v.
COMMODITY FUTURES TRADING COMMISSION, ContiCommodity
Services, Inc. and Richard L. Sandor, Respondents.
MORTGAGE SERVICES OF AMERICA, Petitioner,
v.
COMMODITY FUTURES TRADING COMMISSION, ContiCommodity
Services, Inc. and Richard L. Sandor, Respondents.
 Nos. 83-1703, 83-1704.
 United States Court of Appeals, District of Columbia Circuit.
 Argued March 26, 1984.
Decided August 10, 1984.
 
 Petitions for Review of an Order of the Commodity Futures Trading commission.
 Leslie J. Carson, Jr., Philadelphia, Pa., for petitioners in Nos. 83-1703 and 83-1704. Mark R. Eaton, Alexandria, Va., also entered an appearance for petitioners in Nos. 83-1703 and 83-1704.
 Robert L. Byman, Chicago, Ill., for respondent, ContiCommodity Services, Inc. in Nos. 83-1703 and 83-1704.
 Nancy E. Yanofsky, Attorney, Commodity Futures Trading Commission, Washington, D.C., with whom Kenneth M. Raisler, General Counsel and Whitney Adams, Deputy Gen. Counsel, Commodity Futures Trading Commission, Washington, D.C., were on the brief for respondent, Commodity Futures Trading Commission in Nos. 83-1703 and 83-1804.
 Before GINSBURG, Circuit Judge, MacKINNON, Senior Circuit Judge, and PARKER,* United States District Judge for the District of Columbia.
 Opinion for the Court filed by Circuit Judge GINSBURG.
 GINSBURG, Circuit Judge:
 
 
 1
 The principal question raised by this petition for review is whether the Commodity Futures Trading Commission ("CFTC" or "Commission") has authority to entertain counterclaims not alleging violations of the Commodity Exchange Act[1] ("CEA" or "Act") or CFTC regulations. Article III concerns impel us to construe the Act to deny the Commission that authority.
 
 
 2
 Petitioners William T. Schor and Mortgage Services of America (hereinafter collectively referred to as "Schor") filed complaints with the Commission seeking approximately $1.8 million in damages (reparations) from respondents ContiCommodity Services, Inc. and Richard L. Sandor (hereinafter collectively referred to as "Conti"). Schor alleged that Conti had committed sundry violations of the Act and CFTC regulations in handling Schor's financial futures accounts.[2] Conti counterclaimed to recover over $90,000 in post-liquidation deficit balances in Schor's accounts.
 
 
 3
 After discovery, briefing, and a three-day trial, the Administrative Law Judge ("ALJ" or "Law Judge") ruled against Schor on all aspects of his complaints and in favor of Conti on its counterclaims. The Commission declined to review the ALJ's decision; Schor then petitioned for judicial review. On all but one matter--Schor's contentions that Sandor "traded ahead" for his own account--we affirm the dismissal of Schor's complaints; on that sole matter, we remand to the Commission for an initial determination. On the principal question Schor's petition poses, we hold that the CFTC lacks authority (subject matter competence) to adjudicate Conti's counterclaims; we therefore reverse the ALJ's decision on the counterclaims and instruct their dismissal for lack of jurisdiction.
 
 I. BACKGROUND
 
 4
 Petitioner Schor is the president and majority stockholder of petitioner Mortgage Services of America ("MSA"). MSA is a mortgage banker; it makes mortgage loans and then sells them to long-term investors. To hedge against shifts in interest rates, Schor entered the financial futures market.
 
 
 5
 Respondent Conti is a futures commission merchant registered with the CFTC. Respondent Sandor was the account executive at Conti in charge of Schor's accounts. Schor opened his Conti accounts in September 1976; at that time, Schor and MSA had a net worth of approximately $235,000 each. Over the next three years, Schor developed a heavily net "long" position.[3] He occasionally made additional deposits to his accounts in response to Conti's margin calls.[4] At the time of the events principally at issue in this proceeding, Schor's accounts were seriously undermargined.
 
 
 6
 On October 6, 1979, the Federal Reserve Board announced decisions Schor deemed likely to increase interest rates, thereby rendering unenviable his net long position.[5] On the following Monday--October 8--petitioner Schor attempted to call respondent Sandor for the alleged purpose of taking up short positions to hedge against rising interest rates. Sandor was out of the office that day; Schor spoke instead with several other Conti employees.
 
 
 7
 In testimony before the ALJ, the parties presented sharply conflicting versions of the Schor-Conti October 8, 1979, conversations. Schor insists that he wanted to take up short positions, but was blocked from trading because of instructions Sandor had given concerning Schor's accounts. Conti, on the other hand, presented evidence suggesting that Schor merely sought market information, but declined to trade when asked if he wished to do so.
 
 
 8
 When Schor spoke to Sandor the following day--October 9--Schor stated that further margin calls on petitioners' accounts could not be met. Pursuant to the parties' customer agreement, Conti then liquidated Schor's accounts. After liquidation, Schor's accounts retained substantial deficit balances.
 
 
 9
 In February 1980, Schor filed reparations complaints with the CFTC to recover from Conti losses suffered in Schor's futures trading ventures; he alleged numerous violations of the Commodity Exchange Act and CFTC regulations. Conti counterclaimed to recover the deficit balances remaining in Schor's accounts.[6] After trial in March 1981, the ALJ issued an initial decision denying relief to Schor and awarding judgment to Conti on its counterclaims. See Initial Decision, CFTC Docket No. R 80-566-80-723 (Oct. 19, 1981), reprinted in Appendix ("App.") 869-80.[7] The Commission found no question of law or policy warranting its consideration of the merits of the ALJ's determinations; it therefore allowed the initial decision to become final. See Order Denying Review, CFTC Docket No. R. 80-566-80-723 (June 15, 1983), reprinted in App. 939-40.[8] Schor then petitioned for this court's review.[9]
 
 II. PETITIONERS' CLAIMS
 
 10
 Schor maintains that, in dismissing his reparations claims, the ALJ erred in several critical respects. With one exception, we find Schor's objections utterly insubstantial.
 
 
 11
 First, Schor asserts that Conti neglected "to issue margin calls adequate to meet margin requirements and to enforce those requirements by liquidation of the accounts if they remained undermargined for any period of time." Petitioners' Brief at 32. These alleged oversights, Schor contends, violated the CEA's anti-fraud provision, 7 U.S.C. Sec. 6(b), as well as the Commission regulation requiring futures brokers to "diligently supervise the handling of all commodity interest accounts," 17 C.F.R. Sec. 166.3 (1983). The Commission has repeatedly ruled that a futures broker's decisions concerning margin requirements, even if in violation of commodity exchange rules, are subject to review only under the lenient business judgment rule unless bad faith is shown. See Friedman v. Dean Witter & Co., [1980-1982 Transfer Binder] COMM.FUT.L.REP. (CCH) p 21,307, at 25,536-38 (Nov. 13, 1981); Graves v. Shearson Hayden Stone, Inc., [1980-1982 Transfer Binder] COMM.FUT.L.REP. (CCH) p 21,301, at 25,521-22 (Oct. 14, 1981); Baker v. Edward D. Jones & Co., [1980-1982 Transfer Binder] COMM.FUT.L.REP. (CCH) p 21,167, at 24,770-72 (Jan. 27, 1981), appeal dismissed sub nom. Baker v. CFTC, 661 F.2d 871 (10th Cir.1981) (per curiam).
 
 
 12
 We uphold the Commission's position as a reasonable interpretation of the Act. See, e.g., First Commodity Corp. v. CFTC, 676 F.2d 1, 4-7 (1st Cir.1982); British American Commodity Options Corp. v. Bagley, 552 F.2d 482, 489-92 (2d Cir.), cert. denied, 434 U.S. 938, 98 S.Ct. 427, 54 L.Ed.2d 297 (1977). See generally Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 381, 89 S.Ct. 1794, 1802, 23 L.Ed.2d 371 (1969) ("[T]he construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong....") (footnote omitted). The CFTC's business judgment approach reflects the "special status accorded margin under the Commodity Exchange Act." Baker v. Edward D. Jones & Co., [1980-1982 Transfer Binder] COMM.FUT.L.REP. (CCH) at 24,770. The CEA specifically excepts "the setting of levels of margin" from the Commission's authority to approve, disapprove, or alter contract market rules. Id.; see 7 U.S.C. Secs. 7a(12), 12a(7)(C). Futures brokers have an incentive, wholly apart from CFTC regulation, to impose and enforce reasonable minimum margin requirements; they assume responsibility to third persons for any trading losses sustained, but not honored, by their customers. See P. JOHNSON, COMMODITIES REGULATION Sec. 1.10, at 32 (1982).
 
 
 13
 Schor has not alleged bad faith on the part of Conti in handling margin requirements on petitioners' accounts. Nor would the record support a charge of bad faith. We therefore reject Schor's arguments concerning Conti's alleged failure to police petitioners' margin deposits. Cf. Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Brooks, 548 F.2d 615, 615 (5th Cir.) (per curiam) (rejecting proposition that "a sophisticated commodity futures investor who at all times possessed knowledge of his deficient margin account status ... should not be required to pay back any remaining indebtedness because the extension of credit violated a rule or regulation of the Chicago Board of Trade"), cert. denied, 434 U.S. 855, 98 S.Ct. 173, 54 L.Ed.2d 126 (1977).
 
 
 14
 Schor next attacks the Law Judge's determination that Conti did not "fail[ ] to accept and act upon directions given by [Schor]" on October 8.[10] See Initial Decision at 2, reprinted in App. 870. As earlier stated, the parties presented conflicting accounts of the October 8 telephone conversations between Schor and Conti employees. The testimony on this issue required the ALJ to resolve a credibility question. See id. at 7, reprinted in App. 875. The ALJ's determination that Conti's position was more credible than Schor's is plainly stated and adequately explained. We therefore spy no error in the Law Judge's finding that "Schor ... declined to place any market orders" on October 8. Id. at 8, reprinted in App. 876; see, e.g., Myron v. Hauser, 673 F.2d 994, 1005 (8th Cir.1982); Haltmier v. CFTC, 554 F.2d 556, 561-62 (2d Cir.1977); Silverman v. CFTC, 549 F.2d 28, 32 (7th Cir.1977) (all refusing to disturb ALJ credibility determinations). See generally Universal Camera Corp. v. NLRB, 340 U.S. 474, 496, 71 S.Ct. 456, 468, 95 L.Ed. 456 (1951).
 
 
 15
 Schor further urges that Conti violated the Act and CFTC regulations by allowing Schor to maintain "unsuitable" positions.[11] We need not decide whether a suitability requirement is implicit in the Act.[12] The Law Judge found that petitioners "were eminently suited to trade the futures contracts involved in this proceeding." Initial Decision at 9, reprinted in App. 877. The record amply supports that finding. See, e.g., App. 145 (Schor's testimony as to his considerable experience in futures trading).
 
 
 16
 We turn finally to the sole objection to the ALJ's decision on Schor's claims that warrants a remand. Schor contends that respondent Sandor, after announcing his intention to liquidate petitioners' accounts, first traded for his own account positions identical to petitioners' at a better price than he ultimately obtained for theirs. Schor unambiguously charged before the Law Judge that this alleged conduct violated the CEA and CFTC regulations. See Complainants' Reply Brief at 19 (July 13, 1981), reprinted in App. 795. He repeated the charge in his petition for CFTC review. See Application of MSA for Commission Review of Initial Decision at 25-27 (Nov. 9, 1981), reprinted in App. 922-24. Neither the ALJ's Initial Decision nor the Commission's Order Denying Review addressed Schor's point. As a court of review, we are disinclined to determine the merits of Schor's "trading ahead" claim without benefit of an explicit administrative ruling on it. Accordingly, we return this single aspect of Schor's claims[13] to the Commission for further consideration.
 
 
 17
 III. CFTC JURISDICTION OVER COMMON LAW COUNTERCLAIMS
 
 
 18
 Schor contests the ALJ's judgment in favor of Conti on its breach of contract counterclaims. He argues that the Commodity Exchange Act limits the Commission's jurisdiction over counterclaims to those alleging violations of the Act or CFTC regulations.[14] The Administrative Law Judge remarked that Schor perhaps had "a neat legal point," although its resolution was beyond the ken of an officer "bound by agency regulations and published agency policies." Initial Decision at 11, reprinted in App. 879.
 
 
 19
 The Commission has defined the scope of its counterclaim jurisdiction in Reparation Rule 12.23(b)(2):
 
 
 20
 An answer may set forth as a counterclaim facts alleging a violation and a request for a reparation award that would be a proper subject for a complaint under Sec. 12.21 or any claim which at the time the complaint is served the registrant has against the complainant if it arises out of the transaction or occurrence or series of transactions or occurrences set forth in the complaint.
 
 
 21
 17 C.F.R. Sec. 12.23(b)(2) (1983) (emphasis added). The rule, as interpreted by the Commission, permits CFTC adjudication of deficit balance counterclaims. See Friedman v. Dean Witter & Co., [1980-1982 Transfer Binder] COMM.FUT.L.REP. (CCH) p 21,307 (Nov. 13, 1981). Schor concedes that Conti's counterclaims fall within the Rule 12.23(b)(2) definition. Petitioners' Brief at 27. The question we are called upon to resolve is whether the Commission's broad definition of permissible counterclaims is consistent with the Commodity Exchange Act.
 
 
 22
 Neither party, before the Commission or in presenting the case to this court, discussed the relevance of Article III of the Constitution[15] to the question whether Congress intended, or is empowered to authorize, the CFTC to entertain common law counterclaims. Northern Pipeline Construction Co. v. Marathon Pipe Line Co., 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982) ("Northern Pipeline"), demonstrates that adjudication of state law claims by non-Article III federal tribunals poses serious constitutional questions. Because the issue concerns subject matter jurisdiction, we raised the question on our own motion;[16] we first instructed the parties to address the Article III issue at oral argument,[17] and then invited supplemental briefing.[18]
 
 
 23
 Well established principles of statutory interpretation require us, before reaching difficult constitutional issues, to "ascertain whether a construction of the statute is fairly possible by which the question may be avoided." Ashwander v. TVA, 297 U.S. 288, 348, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936) (Brandeis, J., concurring) (quoting Crowell v. Benson, 285 U.S. 22, 62, 52 S.Ct. 285, 296, 76 L.Ed. 598 (1932)); accord NLRB v. Catholic Bishop, 440 U.S. 490, 500, 99 S.Ct. 1313, 1318, 59 L.Ed.2d 533 (1979); Lynch v. Overholser, 369 U.S. 705, 710-11, 82 S.Ct. 1063, 1067-68, 8 L.Ed.2d 211 (1962); International Association of Machinists v. Street, 367 U.S. 740, 749, 81 S.Ct. 1784, 1789, 6 L.Ed.2d 1141 (1961). In NLRB v. Catholic Bishop, supra, the Supreme Court indicated the sequence of questions a court should address and answer in cases of this sort. See also EEOC v. Pacific Press Publishing Association, 676 F.2d 1272, 1276 (9th Cir.1982). First, we "determine whether the [Commission's] exercise of its jurisdiction here would give rise to serious constitutional questions." 440 U.S. at 501, 99 S.Ct. at 1319. We resolve that inquiry in the affirmative. Therefore, we next ask whether Congress had a "clearly expressed" intention to vest the Commission with the constitutionally questionable jurisdiction. Id. (quoting McCulloch v. Sociedad Nacional, 372 U.S. 10, 22, 83 S.Ct. 671, 678, 9 L.Ed.2d 547 (1963)). Discovering no explicit congressional intention to do so, we conclude that the CEA does not authorize the Commission to adjudicate Conti's breach of contract counterclaims.
 
 A. Article III Inquiry
 Article III of the Constitution provides:
 
 24
 The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish.
 
 
 25
 U.S. CONST. art. III, Sec. 1. "Judges, both of the supreme and inferior Courts," enjoy tenure "during good Behaviour," and receive salaries not subject to diminution during their term of office. Id. It is undisputed that the CEA does not extend these Article III protections to CFTC commissioners. See 7 U.S.C. Sec. 4a(a). We therefore explore the question whether it is compatible with Article III to commit, as the Commission's counterclaim rule does, adjudication of common law, breach of contract counterclaims to officers not enjoying life tenure and irreducible compensation.
 
 
 26
 Supreme Court decisions defining the scope of Congress' discretion to vest federal judicial power in non-Article III tribunals "do not admit of easy synthesis." Northern Pipeline, 458 U.S. at 91, 102 S.Ct. at 2881 (Rehnquist, J., concurring in the judgment).[19] To resolve the matter before us, however, we need not attempt the heraclean labor of rationalizing a host of "arcane distinctions and confusing precedents" accumulated over a span of 150 years. Id. at 90, 102 S.Ct. at 2881. The Supreme Court's latest Article III pronouncement-- Northern Pipeline, supra--conjoined with post-Northern Pipeline court of appeals decisions, generates doubt concerning the constitutionality of Commission Rule 12.23(b)(2) sufficient to impel us to interpret the CEA as withholding from the Commission jurisdiction (subject matter competence) over common law counterclaims.
 
 
 27
 In Northern Pipeline, the Court tested the jurisdictional provision of the Bankruptcy Act of 1978 ("1978 Act"), 28 U.S.C. Sec. 1471 (1982), for compatibility with Article III. The 1978 Act had established bankruptcy courts "in each judicial district, as an adjunct to the district court for such district." Id. Sec. 151(a). These courts were staffed by judges not enjoying Article III's tenure and salary guarantees. See id. Secs. 153(a), 153(b), 154. Nonetheless, Congress authorized the bankruptcy judges to exercise jurisdiction over "all civil proceedings arising under title 11 [the Bankruptcy title] or arising in or related to cases under title 11." Id. Secs. 1471(b), (c). The 1978 Act vested bankruptcy courts with all of the "powers of a court of equity, law, and admiralty," except that they could not "enjoin another court or punish a criminal contempt not committed in the presence of the judge of the court or warranting a punishment of imprisonment." Id. Sec. 1481.
 
 
 28
 Northern Pipeline involved a common law, breach of contract claim brought by a company undergoing chapter 11 reorganization against its purported debtor. Six Justices agreed that Article III prohibits a non-Article III federal tribunal from adjudicating such state law claims over the objection of one of the litigants. But only four members of the Court concurred in Justice Brennan's elaboration of Article III principles; Justice Rehnquist, joined by Justice O'Connor, concurred only in the Court's judgment. We therefore examine both the plurality and concurring opinions in Northern Pipeline for the light they shed on the Article III problem at hand. We also look to post-Northern Pipeline circuit court decisions holding the 1979 Magistrates Act compatible with Article III; these decisions provide instruction on whether petitioners' putative consent ameliorates any otherwise existing Article III flaws in CFTC adjudication of Conti's common law counterclaims.
 
 
 29
 Justice Brennan's plurality opinion in Northern Pipeline considered, and rejected, two theories proffered to rescue bankruptcy court jurisdiction from constitutional assault: the "legislative court" exception; and the Article III court "adjunct" accommodation. CFTC jurisdiction over common law counterclaims does not fit within either theory under Justice Brennan's analysis.
 
 
 30
 The Northern Pipeline plurality initially considered the claim that bankruptcy courts may be placed under the Article III exception carved long ago for "legislative courts."[20] Justice Brennan recognized "three narrow situations" in which Article III allows Congress to vest the judicial power of the United States in federal tribunals not cloaked with Article III protections. See 458 U.S. at 64, 102 S.Ct. at 2868. The first two exceptions--territorial courts and courts martial--were clearly inapplicable in Northern Pipeline, see id. at 64-66, 102 S.Ct. at 2868-69, and are no more relevant here. The third exception recognized by the plurality involved legislative court adjudication of "public rights" cases. Id. at 67, 102 S.Ct. at 2869.[21] The CFTC argues that Commission reparations proceedings "fall squarely within the 'public rights' predicate for legislative court jurisdiction advanced by the [Northern Pipeline ] plurality." Commission Supplemental Brief at 28.
 
 
 31
 Justice Brennan explained the public rights doctrine principally in separation of powers terms:
 
 
 32
 [T]he Framers expected that Congress would be free to commit [matters arising between the Government and persons subject to its authority] completely to nonjudicial determination, and ... as a result there can be no constitutional objection to Congress' employing the less drastic expedient of committing their determination to a legislative court or an administrative agency.
 
 
 33
 458 U.S. at 67, 68, 102 S.Ct. at 2869, 2870 (citing Crowell v. Benson, 285 U.S. 22, 50, 52 S.Ct. 285, 292, 76 L.Ed. 598 (1932)) (footnote omitted). The plurality acknowledged that the public/private rights distinction "has not been definitively explained in [the Court's] precedents." 458 U.S. at 69, 102 S.Ct. at 2870 (footnote omitted). However, for a matter to fall within the public rights doctrine, Justice Brennan stated, it "must at a minimum arise 'between the government and others.' " Id. (quoting Ex parte Bakelite Corp., 279 U.S. 438, 451, 49 S.Ct. 411, 413, 73 L.Ed. 789 (1929)); see also 458 U.S. at 69 n. 23, 102 S.Ct. at 2870 n. 23. Thus, for example, the Northern Pipeline plurality acknowledged that the actual discharge in bankruptcy, in contrast to adjudication of the bankrupt's common law claims against third parties, "may well be a 'public right.' " Id. at 71, 102 S.Ct. at 2871.
 
 
 34
 "Private-rights disputes," on the other hand, involve the liability of one individual to another; they "lie at the core of the historically recognized judicial power." Id. at 69-70, 102 S.Ct. at 2870-71. Such cases, the plurality stated, may not be adjudicated by congressionally-established legislative courts. As in Northern Pipeline, respondent Conti's counterclaims involve "adjudication of state-created private rights, such as the right to recover contract damages"; claims of this kind "obviously [are] not [public rights]." See id. at 71, 102 S.Ct. at 2871.
 
 
 35
 Appellants in Northern Pipeline also sought to validate the bankruptcy court as an "adjunct" of the Article III district court. The plurality read precedent in point--Crowell v. Benson, 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed. 598 (1932), and United States v. Raddatz, 447 U.S. 667, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980)--as establishing two principles relevant to Congress' allocation of "traditionally judicial functions" to non-Article III adjuncts. 458 U.S. at 80-81, 102 S.Ct. at 2876-77. First, Justice Brennan stated, "when Congress creates a substantive federal right, it possesses substantial discretion to prescribe the manner in which that right may be adjudicated--including the assignment to an adjunct of some functions historically performed by judges." Id. at 80, 102 S.Ct. at 2876 (footnote omitted). Second, "the functions of the adjunct must be limited in such a way that 'the essential attributes' of judicial power are retained in the Art. III court." Id. at 81, 102 S.Ct. at 2876 (quoting Crowell, 285 U.S. at 51, 52 S.Ct. at 292).
 
 
 36
 The plurality found bankruptcy court jurisdiction over state law claims constitutionally suspect under both principles. Possible distinctions between the bankruptcy courts and the CFTC are of insufficient weight to persuade us that Justice Brennan's Northern Pipeline opinion is of limited relevance to this case; we have serious doubts whether Commission jurisdiction over common law counterclaims satisfies either of the Northern Pipeline plurality's principles concerning congressional discretion to assign to non-Article III adjuncts the nation's "judicial power."
 
 
 37
 While Justice Brennan acknowledged broad congressional authority to create adjuncts "to aid in the adjudication of congressionally created statutory rights," he determined that Article III places greater restraints on Congress' ability to "assign[ ] traditionally judicial power to adjuncts engaged in the adjudication of rights not created by Congress." 458 U.S. at 81-82, 102 S.Ct. at 2877 (emphasis in original); see also id. at 83-84, 102 S.Ct. at 2877-78. The Northern Pipeline plurality opinion, in short, indicates that Congress has "minimal" discretion to assign adjudication of Conti's state-created rights to a non-Article III adjunct. Id. at 84, 102 S.Ct. at 2878; see also Kalaris v. Donovan, 697 F.2d 376, 386 (D.C.Cir.) ("Northern Pipeline effectively held that certain private state law claims, when adjudicated within the federal system, must be decided by Article III courts.") (emphasis in original) (footnote omitted), cert. denied, --- U.S. ----, 103 S.Ct. 3088, 77 L.Ed.2d 1349 (1983).[22]
 
 
 38
 CFTC adjudication of Conti's state law counterclaims is also vulnerable under the second "adjunct" principle announced by Justice Brennan. That principle--ultimate decisionmaking power should remain with the Article III tribunal rather than the adjunct--encompasses several related notions. The Northern Pipeline plurality's discussion of the principle focused upon the Court's earlier decision in United States v. Raddatz, 447 U.S. 667, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980).
 
 
 39
 In Raddatz the Court held that Article III permits the adjudication of constitutional claims, i.e., non-congressionally-created rights, by a magistrate not cloaked with Article III protections.[23] "Critical to the [Raddatz ] Court's decision to uphold the Magistrates Act," Justice Brennan explained, "was the fact that the ultimate decision was made by the district court," 458 U.S. at 83, 102 S.Ct. at 2877 (citing Raddatz, 447 U.S. at 683, 100 S.Ct. at 2416); the Magistrates Act provided for district court de novo review of the magistrate's proposed findings and recommendations. See Raddatz, 447 U.S. at 681-82, 100 S.Ct. at 2415-16; 28 U.S.C. Sec. 636(b)(1) (1976). Indeed, the Raddatz Court stated that "[w]e view the statutory scheme here as rendering a magistrate's recommendations more analogous to a master or a commissioner than to an administrative agency for Art. III purposes." 447 U.S. at 682-83, 100 S.Ct. at 2415-16 (emphasis added) (footnote omitted).
 
 
 40
 The CEA provides that Commission findings of fact are conclusive "if supported by the weight of the evidence." 7 U.S.C. Sec. 9. That standard of review does not permit the reviewing court to "reweigh[ ] the evidence to ascertain in which direction it preponderates"; rather, the court must limit itself to "review[ing] the record with the purpose of determining whether the finder of ... fact ... acted reasonably, in concluding that the evidence ... supported his findings." Haltmier v. CFTC, 554 F.2d 556, 560 (2d Cir.1977) (quoting Great Western Food Distributors, Inc. v. Brannan, 201 F.2d 476, 479-80 (7th Cir.), cert. denied, 345 U.S. 997, 73 S.Ct. 1140, 97 L.Ed. 1404 (1953)); accord Precious Metals Associates, Inc. v. CFTC, 620 F.2d 900, 903 (1st Cir.1980). Thus, in contrast to Raddatz, "ultimate decisionmaking authority" under the CEA does not "clearly remain[ ] with the [federal] court." Northern Pipeline, 458 U.S. at 79, 102 S.Ct. at 2876 (citing Raddatz, 447 U.S. at 682, 100 S.Ct. at 2415); see also In re Kaiser, 722 F.2d 1574, 1581 (2d Cir.1983); White Motor Corp. v. Citibank, 704 F.2d 254, 263 (6th Cir.1983) (both relying, in part, on provision for district court de novo review of certain bankruptcy court decisions in rejecting Article III challenge to Interim Bankruptcy Rules).
 
 
 41
 Justice Brennan noted two other ways in which Raddatz magistrates "were subject to sufficient control by an Art. III district court." 458 U.S. at 79, 102 S.Ct. at 2875. Judicial control is significant to the constitutional inquiry because, as the Court has often stated, Article III's tenure and salary guarantees principally serve a separation of powers function; their dominant purpose is "to ensure the independence of the Judiciary from the control of the Executive and Legislative Branches of government." Id. at 59, 102 S.Ct. at 2865 (footnote omitted); accord United States v. Will, 449 U.S. 200, 217-20, 101 S.Ct. 471, 481-83, 66 L.Ed.2d 392 (1980); O'Donoghue v. United States, 289 U.S. 516, 530-35, 53 S.Ct. 740, 743-45, 77 L.Ed. 1356 (1933). By placing large measures of control over magistrates in the federal judiciary, rather than in the President or Congress, the Magistrates Act avoided some of the constitutional pitfalls the Court found in the Bankruptcy Act of 1978. No similar features appear in the Commodity Exchange Act.
 
 
 42
 As a first element of judicial control distinguishing the Magistrates Act from the Bankruptcy Act of 1978, magistrates "were appointed, and subject to removal, by the district court." Northern Pipeline, 458 U.S. at 79, 102 S.Ct. at 2875 (citing Raddatz, 447 U.S. at 685, 100 S.Ct. at 2417 (Blackmun, J., concurring)) (footnote omitted). The Magistrates Act provided that the Judicial Conference of the United States, composed exclusively of Article III judges, see 28 U.S.C. Sec. 331, would determine the number of magistrate positions for each district. Id. Sec. 633(b). The Act further provided for selection of magistrates by the judges of the judicial district in which the magistrates were to serve. Id. Sec. 631(a). Those same judges had authority to remove a magistrate from office during the term of appointment "for incompetency, misconduct, neglect of duty, or physical or mental disability." Id. Sec. 631(h). Additionally, a particular magistrate's office could be terminated upon a Judicial Conference determination "that the services performed by his office are no longer needed." Id.
 
 
 43
 The Commodity Futures Trading Commission, on the other hand, is "an independent agency of the United States Government." 7 U.S.C. Sec. 4a(a). Commissioners are appointed, not by the judiciary, but by the President, with the advice and consent of the Senate. Id. While no more than three of the five commissioners may be of the same political party, the statute is designed to allow the President to appoint one new Commissioner each year. Id. Thus, what was said of the Magistrates Act cannot be said of the CEA--that "the only conceivable danger of a 'threat' to the 'independence' of the [adjudicator] comes from within, rather than without, the judicial department." Raddatz, 447 U.S. at 685, 100 S.Ct. at 2417 (Blackmun, J., concurring), quoted in Northern Pipeline, 458 U.S. at 79 n. 30, 102 S.Ct. at 2875 n. 30.
 
 
 44
 A second judicial control found in the Magistrates Act, Justice Brennan observed, concerned the district courts' referral authority: "[T]he magistrate considered [suppression] motions only upon reference from the district court." 458 U.S. at 79, 102 S.Ct. at 2875. The Magistrates Act did not compel the district court to refer any matters to the magistrate. See Raddatz, 447 U.S. at 685, 100 S.Ct. at 2417 (Blackmun, J., concurring). Moreover, when references were made, the district courts "establish[ed] rules pursuant to which the magistrates ... discharge[d] their duties." 28 U.S.C. Sec. 636(b)(4); see Raddatz, 447 U.S. at 685, 100 S.Ct. at 2417 (Blackmun, J., concurring).
 
 
 45
 The federal judiciary exercises no similar control over the CFTC. Whether a matter will be initially determined by an Article III court or the Commission depends entirely upon the actions of private litigants. Once a party selects the CFTC as its forum, the federal courts' only potential involvement is as an enforcer of reparation awards, 7 U.S.C. Sec. 18(f), or as a reviewer of judgments, id. Sec. 18(g). Thus, we cannot say here that "the institutional interests of the judiciary are secured by the district court's control over ... the references." Goldstein v. Kelleher, 728 F.2d 32, 36 (1st Cir.1984) (upholding constitutionality of 1979 Magistrates Act); see also In re Kaiser, 722 F.2d 1574, 1581 (2d Cir.1983); White Motor Corp. v. Citibank, 704 F.2d 254, 263 (6th Cir.1983) (both relying, in part, on the district court's specific authority to revoke referral of particular cases to bankruptcy court in rejecting Article III challenge to Interim Bankruptcy Rules).
 
 
 46
 The Commission further seeks to validate its counterclaim rule by analogizing CFTC reparations proceedings to arbitration; in both settings, the Commission argues, "the parties voluntarily elect to submit their claims to a non-Article III forum." Commission Supplemental Brief at 14 n. 9; see also Conti Supplemental Brief at 20-23. Arbitration, however, is not an apt analogy; it does not implicate the separation of powers concerns motivating the Northern Pipeline decision. Private parties may, without offense to the Constitution, agree to settle their disputes outside the federal adjudicatory system; district court enforcement of arbitration awards is not alone sufficient to require the invocation of Article III safeguards. Constitutional constraints are called into play, however, when Congress establishes a comprehensive adjudicatory alternative to the federal courts--such as the CFTC--without providing tenure and salary guarantees.
 
 
 47
 In sum, Justice Brennan's plurality opinion in Northern Pipeline raises grave doubts concerning the constitutionality of CFTC Rule 12.23(b)(2).[24] Since only four members of the Court joined that opinion, however, we look to Justice Rehnquist's concurrence (joined by Justice O'Connor) to detect the holding of the Court. See Gregg v. Georgia, 428 U.S. 153, 169 n. 15, 96 S.Ct. 2909, 2923 n. 15, 49 L.Ed.2d 859 (1976) (plurality opinion) ("[T]he holding of the Court may be viewed as that position taken by those Members who concurred in the judgment[ ] on the narrowest grounds ...."); accord Marks v. United States, 430 U.S. 188, 193, 97 S.Ct. 990, 993, 51 L.Ed.2d 260 (1977); United States v. Martino, 664 F.2d 860, 872 (2d Cir.1981), cert. denied, 458 U.S. 1110, 102 S.Ct. 3493, 73 L.Ed.2d 1373 (1982); McCormick v. Edwards, 46 F.2d 173, 178 n. 11 (5th Cir.), cert. denied, 454 U.S. 1017, 102 S.Ct. 552, 70 L.Ed.2d 415 (1981) (all quoting Gregg ).
 
 
 48
 Both Conti and the Commission stress language in Justice Rehnquist's concurrence limiting his agreement with the plurality to instances in which parties are deprived of an Article III forum against their will. See Conti Supplemental Brief at 4-5; Commission Supplemental Brief at 3-4, 11 (quoting 458 U.S. at 91, 102 S.Ct. at 2881 (Rehnquist, J., concurring)).[25] Schor's decision to air his complaints of CEA and CFTC regulations violations before the Commission, respondents contend, constituted consent to CFTC adjudication of Conti's common law counterclaims. Schor could have secured an Article III tribunal's adjudication of Conti's breach of contract counterclaims, respondents suggest, by filing his own claims in federal court rather than with the Commission. See Conti Supplemental Brief at 2 & n. 1; Commission Supplemental Brief at 10-11. Some courts had held, at the time Schor initiated these proceedings, that the CEA established an implied federal right of action in district court for damages on behalf of defrauded commodity investors, see, e.g., Hirk v. Agri-Research Council, Inc., 561 F.2d 96, 103 n. 8 (7th Cir.1977); Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Goldman, 593 F.2d 129, 133 n. 7 (8th Cir.1979) (dictum); the Supreme Court later reached the same conclusion in Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran, 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982) (5-4 decision). But see infra, p. 1276, note 27.
 
 
 49
 We return shortly to the character of Schor's alleged consent. See infra pp. 1276-77. At this juncture, we simply note that we do not share Conti's assurance that "[u]nder Northern Pipeline consent of the parties is sufficient to uphold the CFTC reparations procedure under Article III." Conti Supplemental Brief at 3. Justices Rehnquist and O'Connor limited their position to the case at hand--one in which a party was summoned before a non-Article III tribunal over its objection. See 458 U.S. at 91, 102 S.Ct. at 2881. Sensible interpretation of judicial opinions avoids converting a carefully crafted limitation on a holding into its ratio decidendi. The most we can fairly say of Northern Pipeline is that it provides no "determinative principle" for evaluating the constitutionality of non-Article III adjudicatory schemes that operate only with the litigants' consent. See Wharton-Thomas v. United States, 721 F.2d 922, 928 (3d Cir.1983).
 
 
 50
 For guidance on the consent concept, we consider next several post-Northern Pipeline circuit court decisions determining the compatibility with Article III of the 1979 amendments to the Magistrates Act. The Federal Magistrates Act of 1979, Pub.L. No. 96-82, Sec. 2, 93 Stat. 643 (codified at 28 U.S.C. Sec. 636(c) (1982)), allows a magistrate not enjoying Article III protections, with the consent of the parties, to try civil cases and enter final judgments. Six federal appeals courts have thus far upheld the constitutionality of that scheme: Lehman Brothers Kuhn Loeb, Inc. v. Clark Oil Refining Corp., 739 F.2d 1313 (8th Cir.1984) (en banc); Puryear v. Ede's Ltd., 731 F.2d 1153 (5th Cir.1984); Collins v. Foreman, 729 F.2d 108 (2d Cir.1984); Goldstein v. Kelleher, 728 F.2d 32 (1st Cir.1984); Pacemaker Diagnostic Clinic of America, Inc. v. Instromedix, Inc., 725 F.2d 537 (9th Cir.1984) (en banc) ("Pacemaker"); Wharton-Thomas v. United States, 721 F.2d 922 (3d Cir.1983). No circuit has precedent to the contrary. However, the rulings on the constitutionality of the 1979 amendments to the Magistrates Act fail to alleviate our doubts concerning the constitutionality of CFTC jurisdiction over common law counterclaims for two reasons: those rulings rely on express consent, not consent by operation of law or agency rule; and they stress the control exercised over the magistrate by the district court.
 
 
 51
 The consent required for non-Article III adjudication under the Magistrates Act differs significantly from petitioners' putative consent to CFTC adjudication of Conti's counterclaims. Parties deciding whether to try their case before a magistrate or an Article III court exercise a relatively unfettered choice. Because litigant consent has been held "essential to the constitutionality of the [1979 Magistrates] Act," courts are "careful to guard against any compulsion to induce consent through the imposition of costs, delays, or other penalties." Pacemaker, 725 F.2d at 546.
 
 
 52
 We cannot say that Schor has manifested equally unburdened assent to CFTC jurisdiction over Conti's counterclaims. Far from expressly inviting Commission adjudication of the counterclaims, Schor forcefully argued, both before and after the ALJ's Initial Decision, that the Commission lacks statutory authority to award Conti breach of contract damages. See Complainants' Objections to Proposed Initial Decision at 2-4, reprinted in App. 859-61; Application of MSA for Commission Review of Initial Decision at 5-9, reprinted in App. 902-06.
 
 
 53
 Respondents maintain, in essence, that Schor and MSA have indirectly or implicitly consented to CFTC adjudication of Conti's counterclaims:
 
 
 54
 The reparations complainant, by foregoing his right to proceed in federal or state court and electing to file a complaint with the Commission, consents by his conduct to Commission adjudication of his claim and any counterclaim arising from the same commodities transactions forming the basis of his complaint.
 
 
 55
 Commission Supplemental Brief at 11 (citation omitted); see also Conti Supplemental Brief at 2. Assuming arguendo that a party's consent is not only necessary but also sufficient to resolve Article III objections to a particular adjudicatory scheme--an issue we do not decide here[26]--Schor's submission to the CFTC's counterclaim adjudication was effected not by his affirmative choice but by operation of Commission rule. We see no indication in the Magistrates Act decisions that consent thus exacted avoids constitutional shoals. On the contrary, those decisions emphasize the importance of express, uncoerced consent. See Collins, 729 F.2d at 120; Goldstein, 728 F.2d at 35; Pacemaker, 725 F.2d at 543, 546; Wharton-Thomas, 721 F.2d at 926 & n. 7.
 
 
 56
 Commission Rule 12.23(b)(2) presents complainants positioned as Schor is with this choice: File a reparations complaint with the Commission and "consent" to relinquish the right to have an Article III tribunal adjudicate the broker's related common law claims; or forgo the congressionally-established right to a Commission determination of a reparations complaint in order to preserve Article III adjudication of any related state law claim the broker may assert.[27] This is hardly the carefully guarded, cost-free consent the Ninth Circuit declared "essential to the constitutionality of the [Magistrates] Act." Pacemaker, 725 F.2d at 546.
 
 
 57
 The Magistrates Act decisions afford scant support for upholding Commission Rule 12.23(b)(2) for a second reason. The Magistrates Act cases do not hold, as respondent Conti intimates they do, see Conti Supplemental Brief at 3, that litigant consent is not only necessary, but also independently sufficient, to overcome Article III objections to magistrates' final adjudication of civil cases. Rather, the decisions upholding the constitutionality of the 1979 Magistrates Act focus additionally upon the control Article III district courts exercise over magistrates. See Collins, 729 F.2d at 114-15; Goldstein, 728 F.2d at 35, 36; Pacemaker, 725 F.2d at 540, 544-46; Wharton-Thomas, 721 F.2d at 926-27, 930.
 
 
 58
 The 1979 Magistrates Act retains in the district court two controls that Northern Pipeline's plurality considered central to the Raddatz holding. First, the 1979 amendments do not alter the method of magistrate appointment and removal; the judiciary, not the other branches of government, exercises control. See supra p. 1273. Second, the district courts under the 1979 Act control case references, as they did under the version of the Magistrates Act at issue in Raddatz. To conduct civil trials with the parties' consent, the magistrate must be "specially designated to exercise such jurisdiction by the district court or courts he serves." 28 U.S.C. Sec. 636(c)(1) (1982). Moreover, even "specially designated" magistrates can be deprived of their jurisdiction in particular matters "for good cause shown on [the district court's] own motion, or under extraordinary circumstances shown by any party." Id. Sec. 636(c)(6). The legislative history of the 1979 Magistrates Act indicates that "good cause" encompasses "any ... case containing sensitivities such that determination by an Article III judge is required to insure the appearance and reality of independence and impartiality in the decision." Pacemaker, 725 F.2d at 545 (citing S.Rep. No. 74, 96th Cong., 1st Sess. 14 (1979) (U.S.Code Cong. & Admin.News 1979, pp. 1469, 1483).
 
 
 59
 In sum, the Commodity Exchange Act, in contrast to the Magistrates Act, does not place the CFTC under the immediate and constant control of Article III judges. See supra, p. 1273. Moreover, the affirmative consent required under the Magistrates Act differs substantially from the consent exacted by CFTC rule; even if, under some circumstances, litigant consent alone may save an otherwise questionable adjudicatory scheme from constitutional attack, we do not believe petitioners' putative consent provides secure validation for the instant application of CFTC Rule 12.23(b)(2).
 
 
 60
 Serious constitutional problems thus attend CFTC adjudication of common law counterclaims. We have been well advised to avoid "needless determination of constitutional issues ... if [a statute] is fairly susceptible of such a construction." Ralpho v. Bell, 569 F.2d 607, 619 (D.C.Cir.1977) (footnotes omitted); accord Lynch v. Overholser, 369 U.S. 705, 710-11, 82 S.Ct. 1063, 1067-68, 8 L.Ed.2d 211 (1962); International Association of Machinists v. Street, 367 U.S. 740, 749, 81 S.Ct. 1784, 1789, 6 L.Ed.2d 1141 (1961). The Commodity Exchange Act "is fairly susceptible of [an alternative] construction" free from Article III objections: Counterclaims can be limited, as claims are, see 7 U.S.C. Sec. 18(a), to those arising under the CEA or substantive CFTC regulations.
 
 B. The CEA and Its Legislative History
 
 61
 Conti and the CFTC tender several arguments for interpreting the Act to validate Commission Rule 12.23(b)(2). None of their points, taken singly or in combination, convinces us that Congress had a firm intention regarding CFTC jurisdiction over common law counterclaims. In the absence of a clear expression of legislative will, we adopt the construction of the Act that avoids significant constitutional questions.
 
 
 62
 The Commodity Exchange Act, as it existed at the time of Schor's trading and the ALJ's Initial Decision,[28] contained only one reference to counterclaims. Section 14(d) of the CEA directed that complainants not residing in the United States, "before any formal action [would be] taken on [their] complaint,"
 
 
 63
 furnish a bond in double the amount of the claim conditioned upon the payment of costs, including a reasonable attorney's fee for the respondent if the respondent shall prevail, and any reparation award that may be issued by the Commission against the complainant on any counterclaim by respondent.
 
 
 64
 7 U.S.C. Sec. 18(d) (emphasis added). Conti seems to suggest that the quoted section 14(d) language demonstrates congressional recognition of the prospect of counterclaims, and therefore supports its view of the Commission's counterclaim jurisdiction. See Conti Brief at 13. We perceive no clear indication from this section of anything but congressional concern that nonresidents seeking judicial review of adverse Commission reparations awards provide security to protect the respondent. Congress might have contemplated counterclaims only against nonresident complainants, counterclaims against all complainants, counterclaims unlimited in scope, or counterclaims of a narrow compass. In short, we cannot derive the meaning Conti presses from the cryptic 14(d) statement.
 
 
 65
 While counterclaims were explicitly mentioned only in section 14(d) of the CEA, Conti maintains that other sections implicitly evidenced a congressional intention to permit CFTC adjudication of common law counterclaims. Conti points to section 14(f), which stated that "any person for whose benefit [a reparation award] was made" may enforce the judgment in district court, 7 U.S.C. Sec. 18(f) (emphasis added), and to section 14(g), which stated the conditions entitling "any party aggrieved [by a Commission order]" to obtain court of appeals review, id. Sec. 18(g) (emphasis added). Conti argues that these statutory references to "any person" and "any party," rather than to "respondent," "reflected congressional intent that both commodity professionals and customers could receive reparations awards." Conti Brief at 13; see also Commission Brief at 17.
 
 
 66
 Conti's argument, although plausible, is not compelling. Schor's interpretation of the same statutory language is also sensible; he contends that Congress authorized Commission jurisdiction only over counterclaims alleging a violation of the Act or Commission regulations. Petitioners' Brief at 28; see 40 Fed.Reg. 55,666, 55,667 (Dec. 1, 1975) (Commission's proposed counterclaim rule adopting same view of CFTC jurisdiction). Under Schor's construction of the Act, the "any person"/"any party" language in sections 14(f) and (g) accommodates the possibility of a dispute between brokers in which both the main claim and the counterclaim charge violations of the CEA or CFTC regulations. Again, we discern no bright signal of the congressional design in the cited sections.
 
 
 67
 The Commission asserts that courts owe substantial deference to its counterclaim rule as an agency interpretation of its governing statute. Commission Brief at 20 (citing Power Reactor Development Co. v. International Union of Electrical Workers, 367 U.S. 396, 408, 81 S.Ct. 1529, 1535, 6 L.Ed.2d 924 (1961)). We disagree. Courts generally accord respectful consideration to the interpretation placed upon a statute by an agency charged with its administration. See, e.g., NLRB v. Bell Aerospace Co., 416 U.S. 267, 274-75, 94 S.Ct. 1757, 1761-62, 40 L.Ed.2d 134 (1974). When "an agency construes its charter erractically or inconsistently, however, little or no deference will be owed to its decisions." AFGE v. FLRA, 712 F.2d 640, 643 n. 17 (D.C.Cir.1983) (citations omitted); see, e.g., North Haven Board of Education v. Bell, 456 U.S. 512, 522 n. 12, 102 S.Ct. 1912, 1918 n. 12, 72 L.Ed.2d 299 (1982); Southeastern Community College v. Davis, 442 U.S. 397, 411 n. 11, 99 S.Ct. 2361, 2369 n. 11, 60 L.Ed.2d 980 (1979). The CFTC has not maintained a consistent position on the scope of its authority to adjudicate counterclaims. Moreover, the question before us is not one on which a specialized administrative agency, in contrast to a court of general jurisdiction, has superior expertise.
 
 
 68
 The Commission's view of its counterclaim jurisdiction has shifted. The CFTC's first proposed reparations rules would have permitted counterclaims only "if the facts set forth ... allege a violation which would be a proper subject of a reparation complaint." 40 Fed.Reg. 55,666, 55,667 (Dec. 1, 1975). This proposed counterclaim rule, the Commission acknowledged, was "extremely narrow"; however, a "substantial question" existed, the CFTC noted, concerning its statutory authority to permit reparation awards "based on matters other than alleged violations by a registrant." Id. In response to industry comment, the Commission amended its initially proposed rule to permit all counterclaims arising out of the transactions or occurrences set forth in the complaint. See 41 Fed.Reg. 3994, 3995 (Jan. 27, 1976). The CFTC's own recognition that the scope of its statutory authority to adjudicate counterclaims was not crystalline, and its shift from one position to another, "substantially diminish[ ] the deference [owed its] present interpretation of the statute." Southeastern Community College v. Davis, 442 U.S. 397, 411 n. 11, 99 S.Ct. 2361, 2370 n. 11, 60 L.Ed.2d 980 (1979) (citing General Electric Co. v. Gilbert, 429 U.S. 125, 143, 97 S.Ct. 401, 411, 50 L.Ed.2d 343 (1976)).[29]
 
 
 69
 Furthermore, the deference due an agency's interpretation of its governing statute "is more emphatically summoned when the question is one requiring [administrative] expertise in the subject area." Sea-Land Service, Inc. v. Kreps, 566 F.2d 763, 780 n. 15 (D.C.Cir.1977) (Robinson, J., dissenting); accord Wilderness Society v. Morton, 479 F.2d 842, 866 (D.C.Cir.) (en banc), cert. denied, 411 U.S. 917, 93 S.Ct. 1550, 36 L.Ed.2d 309 (1973). Commission Rule 12.23(b)(2) does not "concern[ ] matters within the agency's expertise." Adkins v. Hampton, 586 F.2d 1070, 1073 (5th Cir.1978) (footnote omitted). On the contrary, the statutory interpretation-jurisdictional question presented is precisely the kind with which courts customarily deal. See, e.g., Allied Van Lines, Inc. v. ICC, 708 F.2d 297, 300 (7th Cir.1983) ("question of jurisdiction is plainly not a matter within the Commission's discretion or expertise") (citation omitted); Office of Communication of United Church of Christ v. FCC, 707 F.2d 1413, 1423 (D.C.Cir.1983) ("quintessential function of the reviewing court to interpret legislative delegations of power and to strike down those agency actions that traverse the limits of statutory authority") (footnote omitted); Office of Consumers' Counsel v. FERC, 655 F.2d 1132, 1141 (D.C.Cir.1980). Accordingly, the court's role in determining the issue at hand "should ... be viewed hospitably." Hardin v. Kentucky Utilities Co., 390 U.S. 1, 14, 88 S.Ct. 651, 658, 19 L.Ed.2d 787 (1968) (Harlan, J., dissenting).
 
 
 70
 Conti and the Commission additionally argue that Congress tacitly approved the Commission's current position when it amended the CEA without countermanding the CFTC's counterclaim rule. See Conti Brief at 16; Commission Brief at 22. This point merits consideration,[30] but the notion that Congress effectively adopts all agency regulations it does not alter pushes too far. Placing inordinate emphasis on "congressional silence" can be "treacherous." Girouard v. United States, 328 U.S. 61, 69, 66 S.Ct. 826, 829, 90 L.Ed. 1084 (1946); see also NLRB v. Bell Aerospace Co., 416 U.S. 267, 310, 94 S.Ct. 1757, 1779, 40 L.Ed.2d 134 (1974) (White, J., dissenting in part) ("Congressional silence does not imply legislative approval of all [agency] rulings theretofore made."); Helvering v. Hallock, 309 U.S. 106, 119-20, 60 S.Ct. 444, 451, 84 L.Ed. 604 (1940) ("To explain the cause of non-action by Congress when Congress itself sheds no light is to venture into speculative unrealities.") (footnote omitted). Congress is not obliged to "correct each mistaken [administrative] construction under penalty of incorporating it into the fabric of the statute." F.W. Woolworth Co. v. United States, 91 F.2d 973, 976 (2d Cir.1937) (L. Hand, J.), cert. denied, 302 U.S. 768, 58 S.Ct. 479, 481, 82 L.Ed. 597 (1938). When Congress amends a law without addressing extant administrative rulings, its "failure to take action ... is subject to more than one interpretation." Chisholm v. FCC, 538 F.2d 349, 363 (D.C.Cir.), cert. denied, 429 U.S. 890, 97 S.Ct. 247, 50 L.Ed.2d 173 (1976). Especially in light of the serious constitutional questions attending Commission jurisdiction over common law counterclaims, we resist reading congressional silence as signalling the legislature's advertence to, and approval of, Commission Rule 12.23(b) (2).
 
 
 71
 From fragments of legislative history and the most recent CEA amendments, respondents discern a marked congressional intent to entrust to the Commission broad discretion to define its own counterclaim jurisdiction. First, Conti and the Commission cite a 1974 House Committee Report which stated that "[c]ounterclaims will be recognized in the proceedings ... on such terms and under such circumstances as the Commission may prescribe by regulation." H.R.Rep. No. 975, 93d Cong., 2d Sess. 23 (1974), cited in Conti Brief at 14-15 and Commission Brief at 18-19. Next, respondents emphasize the latest amendments to the CEA, effective since May 1983.[31] Newly enacted section 14(b) provides, in part, that "[t]he Commission may promulgate ... rules, regulations, and orders ... [which] may prescribe ... the nature and scope of ... counterclaims." 7 U.S.C. Sec. 18(b) (1982). Even if not directly operative in the Schor-Conti dispute, respondents maintain, current section 14(b) confirms the intention of Congress all along to allow the Commission to delineate the scope of its counterclaim authority. See Conti Brief at 16; Commission Brief at 2.
 
 
 72
 Reading only the words respondents stress, one might conclude that Congress has indeed left the Commission at liberty to write its own counterclaim jurisdictional ticket. But even in the absence of any constitutional question, it would be extraordinary for a legislature to deliver such a blank check to an administrative tribunal. Both at argument and on brief, the CFTC stated that it "is not aware of any other agencies that expressly render decisions and issue awards on common law claims." Commission Supplemental Brief at 16 n. 13. Conti noted that the CFTC's asserted common law counterclaim jurisdiction "may be unique in the federal system." Conti Supplemental Brief at 20 n. 10. Our independent research has also failed to locate precedent for Commission Rule 12.23(b) (2).
 
 
 73
 Nothing we or the parties have uncovered suggests that Congress meant to confer upon the Commission unprecedented authority. Cf. 2A C. SANDS, SUTHERLAND STATUTORY CONSTRUCTION Sec. 53.01, at 343 (4th ed. 1972) (presumption in favor of legislative regularity). And there is not even a hint that Congress was alerted to, or in any way considered, the Article III problem that pervades our review of the Commission's assertion of jurisdiction to adjudicate common law counterclaims. See Shrader v. Harris, 631 F.2d 297, 301-02 (4th Cir.1980) (refusing to construe statute to raise constitutional questions "[i]n the absence of any manifestation of congressional consideration of th[e] problem [before the court]").
 
 
 74
 In sum, neither Congress nor the CFTC appears to have considered the serious constitutional questions provoked by Commission adjudication of common law counterclaims. The language and legislative history of the CEA contain no clear expression of congressional intent to commit to the Commission extraordinary adjudicatory authority--subject matter competence not exercised by any other federal agency. Considerations of legislative regularity, administrative uniformity, and, most prominently, Article III constraints, impel us to construe the Act to authorize the CFTC to adjudicate only those counterclaims alleging violations of the Act or Commission regulations. See generally NLRB v. Catholic Bishop, 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979) (construing statute to deny NLRB authority to exercise jurisdiction over lay teachers in parochial schools, in part because contrary holding would raise serious questions under the religion clauses of the First Amendment); International Association of Machinists v. Street, 367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961) (construing Railway Labor Act to deny unions, over an employee's objection, power to use the objecting employee's compulsory union dues to support political causes employee opposes, in part because contrary holding would raise serious First Amendment questions); Miller v. United States, 620 F.2d 812 (Ct.Cl.1980) (holding statutory provision setting 6% interest rate for government takings not binding on judiciary, in part because contrary holding would raise serious Fifth Amendment just compensation questions); Daylo v. Administrator of Veterans' Affairs, 501 F.2d 811 (D.C.Cir.1974) (holding statutory amendment prohibiting judicial review of VA benefit termination inapplicable retroactively to final, unappealed district court judgment ordering benefit restoration, in part because contrary holding would raise serious due process questions).
 
 CONCLUSION
 
 75
 We affirm the ALJ's dismissal of Schor's complaints except with regard to the "trading ahead" allegation; on that matter, we vacate the ALJ's decision and remand to the Commission for its initial consideration. We reverse the ALJ's judgment in favor of Conti on its counterclaims and remand with instructions to dismiss the counterclaims for lack of Commission jurisdiction.
 
 
 76
 It is so ordered.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. Sec. 292(a)
 
 
 [1]
 7 U.S.C. Secs. 1-22 (1976). Congress amended the CEA in 1974 to create the Commission and substantially expand the scope of federal regulation of the commodity futures industry. See Commodity Futures Trading Commission Act of 1974, Pub.L. No. 93-463, 88 Stat. 1389 (1974). Schor's suit is governed by the 1974 Act. Congress again significantly revised the Act in early 1983. See Futures Trading Act of 1982, Pub.L. No. 97-444, 96 Stat. 2294 (1983). These latter changes, insofar as they affect CFTC proceedings, became effective only as of May 1983, see id. Sec. 239; they are not operative in these proceedings
 The changes effected in 1983 included renumbering the subsections in section 14 of the Act, 7 U.S.C. Sec. 18. In this opinion, unless otherwise noted, we cite the 1976 United States Code, i.e., the Act as it existed at the time Schor filed his complaint and the ALJ issued his decision.
 
 
 [2]
 Financial futures are contracts to buy or sell interest-bearing investments on a fixed future date. A contract to buy is known as a "long" position; since the owner will be obligated to pay the contract price at the fixed date regardless of the security's market value, the worth of the position will diminish if rising interest rates drive down the security's value. Conversely, a contract to sell (or a "short" position) increases in value as interest rates rise. See generally P. JOHNSON, COMMODITIES REGULATION Secs. 1.03, 1.04 (1982)
 
 
 [3]
 See supra note 2
 
 
 [4]
 A futures customer establishing an account with a futures commission merchant must deposit money--known as a "margin"--to protect the merchant from losses caused by market fluctuations adversely affecting a customer's positions. Changes in market prices for a particular futures contract may erode the original deposit, leading a broker to issue a margin call for additional funds. Margin requirements are established by the exchange where a transaction takes place. See generally P. JOHNSON, supra note 2, Sec. 1.10, at 30-32
 
 
 [5]
 See Petitioners' Brief at 11. The Administrative Law Judge, however, found "[t]here was no consensus among financial traders as to the impact these [October 6] decisions would have o[n] the price of financial futures." Initial Decision, CFTC Docket No. R 80-566-80-723, at 4-5 (Oct. 19, 1981), reprinted in Appendix ("App.") 872-73
 
 
 [6]
 Conti first filed suit to recover the deficit balances in the United States District Court for the Northern District of Illinois. Conti Commodity Services, Inc. v. Mortgage Services of America, Inc., No. 80-C-1089 (N.D.Ill. filed Mar. 4, 1980). Conti later voluntarily dismissed that action, choosing instead to counterclaim in the CFTC proceeding
 
 
 [7]
 Schor argues that the ALJ, by adopting in large part a proposed decision drafted by Conti, impermissibly delegated his decision-writing responsibility. See Petitioners' Brief at 50-53. The Commission, while disapproving this "adoption" technique, held that no reversible abuse of discretion had occurred. Order Denying Review, CFTC Docket No. R 80-566-80-723, at 1 n. 1 (June 15, 1983), reprinted in App. 939 n. 1. We agree that a decisionmaker's wholesale adoption of a party's submission may undermine "[c]onfidence in the integrity of the [administrative] process." Southern Pac. Communications Co. v. AT & T, 740 F.2d 980, 995, (D.C.Cir. 1984). In light of the record made at trial, however, we do not consider the Law Judge's substantial acceptance of Conti's proposed decision independently sufficient grounds for reversal. Cf. Valentino v. United States Postal Serv., 674 F.2d 56, 60 n. 2 (D.C.Cir.1982) (district court's substantial acceptance of appellee's proposed findings did not warrant overturning decision); Hagans v. Andrus, 651 F.2d 622, 626 (9th Cir.) (same), cert. denied, 454 U.S. 859, 102 S.Ct. 313, 70 L.Ed.2d 157 (1981); Hayes v. Thompson, 637 F.2d 483, 490 (7th Cir.1980) (same)
 
 
 [8]
 Schor challenges the Commission's Order Denying Review on the ground that "the Commission permit[ted] [the ALJ] decision to stand based upon reasoning that the Commission rejects." Petitioners' Brief at 54. We read the Commission's Order differently; the Commission stated that it "neither adopted the Presiding Officer's order as its own nor affirmatively passed upon any of the issues decided therein." Order Denying Review at 1, reprinted in App. 939 (footnote omitted). We discern in this language nothing more than a discretionary denial of review, an option Schor concedes to be within the Commission's authority. See Petitioners' Brief at 54; see also 17 C.F.R. Secs. 12.95(e), 12.101 (1983) (stating CFTC policy of providing only discretionary review of ALJ decisions)
 
 
 [9]
 The CEA provides that a party seeking judicial review of a Commission ruling shall
 file[ ] with the clerk of the court a bond in double the amount of the reparation awarded against the appellant conditioned upon the payment of the judgment entered by the court, plus interest and costs, including a reasonable attorney's fee for the appellee, if the appellee shall prevail.
 7 U.S.C. Sec. 18(g). Schor argues that Congress did not intend this appeal bond provision to apply to customers seeking review of counterclaim awards; if the provision does apply to nonregistrant complainants, Schor further contends, it violates the due process clause and the equal protection component of the Fifth Amendment. Petitioners' Brief at 19-25. Our disposition of Conti's counterclaims renders resolution of these issues unnecessary.
 
 
 [10]
 Schor alleges that Conti, by preventing him from trading his accounts on October 8, 1979, violated the Act's anti-fraud provision as well as the Commission's diligent supervision regulation. Petitioners' Brief at 37
 
 
 [11]
 One commentator has described the "suitability doctrine" as follows: "A broker-dealer must have reasonable grounds for believing that all recommendations made are suitable for each customer in light of his financial situation and objectives." T. RUSSO, REGULATION OF THE COMMODITIES FUTURES AND OPTIONS MARKETS Sec. 12.38, at 12-75 (1983) (footnote omitted)
 
 
 [12]
 The CFTC once proposed, but failed to adopt, a suitability rule. See T. Russo, supra note 11, Sec. 12.38, at 12-75--76. On two occasions, the Commission has expressly reserved the question whether a suitability requirement is implicit in the Act. Avis v. Shearson Hayden Stone, Inc., [1980-1982 Transfer Binder] COMM.FUT.L.REP. (CCH) p 21,379, at 25,829 n. 4 (Apr. 13, 1982); Jensen v. Shearson Hayden Stone, Inc., [1980-1982 Transfer Binder] COMM.FUT.L.REP. (CCH) p 21,324, at 25,582 n. 1 (Oct. 9, 1981). At least one federal court has squarely rejected the claim that a commodity broker's failure to find suitable investments violates the Act. J.E. Hoetger & Co. v. Asencio, 558 F.Supp. 1361, 1364 (E.D.Mich.1983); cf. Myron v. Hauser, 673 F.2d 994, 1006 (8th Cir.1982) ("[broker's] liability ... not premised upon violation of a nonexistent suitability standard")
 
 
 [13]
 We reject as frivolous Schor's contention that Conti's counterclaim award should be reduced to reflect the payments respondent Sandor made to Conti to partially offset the post-liquidation deficit balances in Schor's accounts. See Petitioners' Brief at 49-50. Conti policy required Sandor to make those payments. Schor clearly is not an intended beneficiary of that arrangement. See generally J. CALAMARI & J. PERILLO, THE LAW OF CONTRACTS Sec. 17-2, at 607 (2d ed. 1977); L. SIMPSON, HANDBOOK OF THE LAW OF CONTRACTS Sec. 116, at 245-47 (2d ed. 1965)
 
 
 [14]
 Our disposition of the jurisdiction issue makes it unnecessary to reach Schor's further claim that Commission adjudication of common law counterclaims violates his Seventh Amendment right to a jury trial. See Petitioners' Brief at 29-31
 
 
 [15]
 The portions of Article III in point are quoted infra at p. 1269
 
 
 [16]
 See, e.g., Pacemaker Diagnostic Clinic of America, Inc. v. Instromedix, Inc., 725 F.2d 537, 540 (9th Cir.1984) (en banc); Wharton-Thomas v. United States, 721 F.2d 922, 925 (3d Cir.1983) (Article III issue raised by court on own motion); cf. Collins v. Foreman, 729 F.2d 108, 111 (2d Cir.1984) (court refused to hold party waived Article III objection by neglecting to raise it prior to trial)
 
 
 [17]
 Notice, Nos. 83-1703, 83-1704 (D.C.Cir. Mar. 23, 1984)
 
 
 [18]
 The court directed supplemental briefing from the bench at the conclusion of oral argument
 
 
 [19]
 See also Krattenmaker, Article III and Judicial Independence: Why the New Bankruptcy Courts are Unconstitutional, 70 GEO. L.J. 297, 298-99 (1981) ("the precedents in this area are so vague or inconsistent as to prove meaningless at best") (footnote omitted); Redish, Legislative Courts, Administrative Agencies, and the Northern Pipeline Decision, 1983 DUKE L.J. 197, 228 (Article III line of cases "largely confused and unprincipled")
 
 
 [20]
 Chief Justice Marshall inaugurated the legislative courts doctrine in American Ins. Co. v. Canter, 26 U.S. (1 Pet.) 511, 7 L.Ed. 242 (1828)
 
 
 [21]
 See also Atlas Roofing Co. v. OSHRC, 430 U.S. 442, 450, 97 S.Ct. 1261, 1266, 51 L.Ed.2d 464 & n. 7 (1977); Crowell v. Benson, 285 U.S. 22, 50-51, 52 S.Ct. 285, 292-93, 76 L.Ed. 598 (1932); Ex parte Bakelite Corp., 279 U.S. 438, 451, 49 S.Ct. 411, 413, 73 L.Ed. 789 (1929); Murray's Lessee v. Hoboken Land & Improvement Co., 59 U.S. (18 How.) 272, 284, 15 L.Ed. 372 (1856)
 
 
 [22]
 The Commission urges that we validate its Rule 12.23(b)(2) on the ground that counterclaims to recover customer account deficit balances "arise under" federal law within the meaning of Article III. Verlinden B.V. v. Central Bank of Nigeria, 461 U.S. 480, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983), is featured as supporting this argument. Commission Supplemental Brief at 24-27. The Commission's contention seems misfocused in this sense: it addresses Congress' power to place Conti's counterclaim in federal court, rather than what is at issue here--Congress' power to place Conti's counterclaims in a non-Article III federal tribunal
 Even if apposite, the Verlinden analogy fails on its merits. The Commission can identify no express congressional plan deliberately to channel broker-customer contract claims into the CFTC. See 103 S.Ct. at 1973. If Congress had such a plan, the limitation of Commission adjudicatory authority to state law counterclaims would make no sense. Nor do we discern what "detailed federal law standards" an ALJ would be called upon to apply in adjudicating a broker-customer claim to recover deficit balances. See id. at 1971.
 For reasons indicated in the text, we cannot regard the CFTC as an Article III court adjunct and in that capacity equipped to exercise ancillary jurisdiction (see Commission Supplemental Brief at 22-23) over contract-based counterclaims.
 
 
 [23]
 The 1976 Magistrates Act amendments authorized magistrates to adjudicate nondispositive pretrial motions subject to district court review under a clearly erroneous standard. The amendments also empowered magistrates to make findings and recommendations on dispositive pretrial motions and in prisoner cases, subject to de novo district court review upon a party's objection. 28 U.S.C. Sec. 636(b) (1) (1976). The constitutional validity of this latter power was at issue in Raddatz. The 1979 amendments to the Magistrates Act permitted magistrates, upon both parties' consent, to conduct all proceedings in a civil action and to enter final judgment. Id. Sec. 636(c) (1982). See infra p. 1275
 
 
 [24]
 We recognize that the Commodity Exchange Act, if read to authorize Commission adjudication of state common law counterclaims, would not exhibit all of the Article III flaws the Northern Pipeline plurality discovered in the 1978 Bankruptcy Act. In several respects, the CEA retains more of "the essential attributes of the judicial power" in the Article III courts than did the Bankruptcy Act
 First, the CFTC more closely resembles the agency in Crowell v. Benson which dealt only with "a particularized area of law," Northern Pipeline, 458 U.S. at 85, 102 S.Ct. at 2878, than the bankruptcy courts which, under the 1978 Act, were to exercise jurisdiction in "all civil proceedings arising under title 11 or arising in or related to cases under title 11." 28 U.S.C. Sec. 1471(b), quoted in 458 U.S. at 85, 102 S.Ct. at 2878 (Justice Brennan's emphasis). Second, CFTC orders, like those of the agency in Crowell but unlike those of bankruptcy courts under the 1978 Act, are enforceable only by order of the district court. See 7 U.S.C. Sec. 18(f); 458 U.S. at 85-86, 102 S.Ct. at 2878-79. Third, CFTC orders are reviewed under the same "weight of the evidence" standard sustained in Crowell, rather than the more deferential "clearly erroneous" standard found objectionable in Northern Pipeline. See 7 U.S.C. Sec. 9; 458 U.S. at 85, 102 S.Ct. at 2878. Finally, the CFTC, unlike bankruptcy judges under the 1978 Act, does not exercise "all ordinary powers of district courts," including presiding over jury trials and issuing writs of habeas corpus. See 458 U.S. at 85, 102 S.Ct. at 2878.
 These differences between the CFTC and 1978 Act bankruptcy judges do not, however, adequately assuage our doubts concerning the constitutionality of Commission Rule 12.23(b) (2). As discussed in the text, the Commission's composition and authority, established by the CEA, do not test well under the "adjunct" principles Justice Brennan stated and explained in Northern Pipeline.
 
 
 [25]
 Justice Rehnquist stated that no earlier High Court decision elaborating upon Article III "has gone so far as to sanction the type of adjudication to which Marathon will be subjected against its will under the provisions of the 1978 Act." 458 U.S. at 91, 102 S.Ct. at 2881-82 (emphasis added). He limited his holding of unconstitutionality (and therefore the holding of the Court) to "so much of the Bankruptcy Act of 1978 as enables a Bankruptcy Court to entertain and decide Northern's lawsuit over Marathon's objection." Id. (emphasis added)
 
 
 [26]
 Compare Note, Article III Limits on Article I Courts: The Constitutionality of the Bankruptcy Court and the 1979 Magistrate Act, 80 COLUM.L.REV. 560 (1980) (consent insufficient), with McCabe, The Federal Magistrate Act of 1979, 16 HARV.J. ON LEGIS. 343 (1979), and Silberman, Masters and Magistrates Part II: The American Analogue, 50 N.Y.U.L.REV. 1297 (1975) (consent sufficient)
 On the inadequacy of the Commission's and Conti's suggested analogy to arbitration, see supra p. 1274.
 
 
 [27]
 Respondents overstate their case by suggesting that Schor had a clear choice between court and Commission. At the time Schor filed his complaints, the CEA contained no express provision for district court suits; such provision was first made in the 1982 amendments. See 7 U.S.C. Sec. 25 (1982). While some lower federal courts had recognized a private right of action under the CEA prior to the filing of Schor's complaints, see supra p. 1275, the Supreme Court did not affirm that position until 1982, and then only by a 5-4 margin. Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran, 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982)
 Moreover, at least two federal district courts had ruled prior to the filing of Schor's reparations complaints that no implied private right of action existed under the CEA to redress alleged violations of its anti-fraud provisions. Fischer v. Rosenthal & Co., 481 F.Supp. 53 (N.D.Tex.1979); Bartels v. International Commodities Corp., 435 F.Supp. 865 (D.Conn.1977). In brief, Schor confronted an area of law fairly described as unclear. See Rivers v. Rosenthal & Co., 634 F.2d 774, 778 n. 7 (5th Cir.1980) (summarizing holdings), vacated and remanded, 456 U.S. 968, 102 S.Ct. 2228, 72 L.Ed.2d 841 (1982). Respondents' contention that Schor implicitly consented to CFTC adjudication of Conti's counterclaims by forgoing his federal court forum is thus further weakened by the absence of a then-existing clearly established complainant's right to proceed in federal court.
 
 
 [28]
 See supra note 1
 
 
 [29]
 We note that the Commission remains ambivalent on the question whether, once a broker files a common law counterclaim, the customer may add to the reparations complaint related claims arising under state law. See Commission Supplemental Brief at 18 n. 14
 
 
 [30]
 See, e.g., Grove City College v. Bell, --- U.S. ----, ----, 104 S.Ct. 1211, 1219, 79 L.Ed.2d 516 (1984); North Haven Bd. of Educ. v. Bell, 456 U.S. 512, 535, 102 S.Ct. 1912, 1925, 72 L.Ed.2d 299 (1982) (citations omitted); Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran, 456 U.S. 353, 381-82 & n. 66, 102 S.Ct. 1825, 1840-41 & n. 66, 72 L.Ed.2d 182 (1982) (citations omitted)
 
 
 [31]
 See supra, p. 1264, note 1